## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| **STOCKFOOD AMERICA, INC.,**<br><br>                    **Plaintiff,**<br><br>          **v.**<br><br>**ADAGIO TEAS, INC.,**<br><br>                    **Defendant.** | Civ. No. 2:18-cv-16678-KM-MAH<br><br><br>**OPINION** |

**MCNULTY, U.S.D.J.:**

The plaintiff, Stockfood America, Inc. ("Stockfood") alleges that the defendant, Adagio Teas, Inc. ("Adagio") infringed its copyrights in two photographic images by posting the images to its website. Stockfood seeks summary judgment as to the two essential elements of a copyright infringement claim (ownership of a valid copyright and infringement by defendant), and also as to whether Adagio's alleged infringement was willful. Adagio opposes each aspect of the motion. For the reasons stated herein, Stockfood's motion will be granted as to ownership and infringement, but denied as to willfulness, which poses issues of fact.

## I. Background[1]

Defendant Adagio operates a website that provides news and other content related to tea. (PSMF ¶ 5).[2] Plaintiff Stockfood is a photographic agency which maintains a database of stock food images, videos, and other features that it licenses to third parties. (PSMF ¶ 1).

### A. Agency Agreement and Addendum

As relevant here, Stockfood acts as a licensing agent for multiple photographers. Stockfood obtains the images that are its stock in trade from photographers, with whom it enters into standard agreements, entitled "Photographer's Image–Exclusive Agency Agreement" (the "Agency Agreement"). I here summarize one of two relevant agreements, the one between Stockfood (as "Agency") and Pete Eising (as "Photographer"). (DE 20-2 at 1–9).[3] It begins with a statement of purpose:

> The Photographer is in the business of creating Photographs. The Agency is in the business of licensing Photographs. The Photographer and the Agency have determined that it is in their mutual interest to enter into this Agreement in order to appoint the Agency to represent the Photographer for the licensing of the Photographer's Photographs

---

[1]    For purposes of this motion, I consider the parties' statements of material facts, as well as the deposition testimony and documentary evidence. Facts not contested are assumed to be true.

Certain record items will be cited as follows:

PSMF = Plaintiff Stockfood's statement of material facts (DE 18-2)

DRSMF = Defendant Adagio's responsive statement of material facts (DE 21)

Pl. Br. = Plaintiff Stockfood's brief in support of summary judgment (DE 19-1)

Def. Br. = Defendant Adagio's brief in opposition to summary judgment (DE 20).

Reply Br. = Plaintiff Stockfood's reply brief (DE 24)

[2]    Plaintiff claims that this website was used to promote Adagio's tea business. (PSMF ¶ 7). Adagio disputes this, claiming that the website in question, teamuse.com, does not generate revenue, and does not feature any products sold by Adagio. (DRSMF ¶ 7). That dispute is not material to this motion.

[3]    The other relevant agreement, with photographer Rita Maas, is substantially identical. (DE 20-2 at 10–14).

upon such reasonable terms and conditions that the Agency can arrange and in accordance with, as set forth in this document.

(Agency Agreement, DE 20-2 at 1).

The next section specifies the categories of authority that are granted to the Agency. The most pertinent categories are these:

**1. GRANT OF AUTHORITY**:

> **(a) Appointment:** The Photographer hereby appoints the Agency, and the Agency hereby accepts such appointment, as the Photographer's exclusive agent worldwide with respect to licensing the Photographs submitted to the Agency by the Photographer. . . .

> **(c) Restriction on Competition:** The Photographer shall be entitled to engage in assignment photography for his own account, but Photographer agrees, as a material condition of this agreement, not to sell or license any Photographs directly to any clients introduced either to the Photographer, or to his Photographs, by the Agency. . . .

> **(d) Discretion As to Prices:** The Photographer grants the Agency the right to determine, in its complete and sole discretion, the terms, conditions and pricing of Photographs licensed to its clients, except in the event of an outright purchase, in which case the Agency agrees to consult with the Photographer prior to completing such transaction.

> **(e) Discretion As to Lawsuits**: The Agency shall have the sole authority to determine if, and when, any legal action shall be pursued in regard to the Photographs, whether for copyright infringement, loss, damage or any other reason, and shall have complete discretion regarding its choice of attorney. Settlements shall be not subject to the Photographer's prior approval. After deduction of legal expenses, all funds recovered shall be divided in the same manner as set forth in Paragraph 6.

(*Id.* § 1).

Stockfood obligates itself to use best efforts to exploit the photographs by licensing them and collecting licensing fees:

**5. OBLIGATIONS OF AGENCY:**

> **(a) Licensing:** [Agency] shall use its best efforts to license the Photographer's Photographs and to charge and receive reasonable fees

3

for such licensing. Agency will use its best efforts to collect all fees charged for licensing the Photographer's Photographs, including the retention of an attorney for collection, if it deems it appropriate.

(*Id.* § 5).

Additional miscellaneous provisions are as follows:

- Stockfood and the photographer agree to split the net licensing fees 50-50. (*Id.* § 6(a)).

- Stockfood will have the status of independent contractor. (*Id.* § 11).

- The agreement is governed by the law of the State of Maine. (*Id.* § 12(d)).

Each Agency Agreement has the following Addendum, reproduced here in full:

**Stockfood Contract Copyright Addendum**

As a photographer, under current U.S. law you own the copyright to your photographs from the moment you create them. Though registration is not required for copyright protection it is a prerequisite before United States authors can bring an action for infringement in federal court. If your photographs are not registered prior to an act of infringement, you are only entitled to seek actual damages, and cannot ask the court for statutory damages or attorney's fees. This is significant as actual damages may be limited to a license fee where statutory damages, while discretionary with the court, range from $750 to $30,000 and can be increased if the infringement is considered willful, up to a maximum of $150,000.

If you have not already registered your photographs with the copyright office, StockFood can include these photographs as part of the registration of its database of photographs if you agree in writing to assign copyright to StockFood. This is solely for the purposes of registration. StockFood must have your permission in writing in order to proceed. The copyright will be assigned back upon termination or upon request. This will permit StockFood to enforce your rights in court, and seek statutory damages and attorney's fees. You will not lose any rights. The U.S. Copyright Office, together with the Picture Archive Agency of America (PACA) evolved this strategy to make the registration of photographs easier for stock photography libraries.

Please acknowledge your acceptance by signing below:

*In order to protect photographs offered for license by StockFood, if Photographer has not previously registered photographs selected by*

4

*StockFood, Photographer assigns the copyright to StockFood in all accepted Photographs, solely for the purposes of copyright registration. Such registration shall be reassigned to Photographer upon request or termination of the Agreement. This assignment applies to all previously submitted and all Photographs to be submitted under the Agency Agreement.*

(signed)
*Pete A. Eising*
*Photographer*

(Agency Agreement (addendum), DE 20-2 at 9 (*italics* in original)).

### B. This Dispute

This litigation concerns two photographs that were allegedly displayed on Adagio's website. Stockfood says it owns the copyright to these images, referred to as image 00133615 and image 00645460 (the "Images"). (PSMF ¶ 2). The Images are allegedly registered with the United States Copyright Office ("USCO") under Registration Numbers VA 1-341-953 and VA 1-652-320.[4] (PSMF ¶ 3; DE 1-2). Stockfood further claims that the Images are original works as to which it has rights of authorship. (PSMF ¶ 3). Adagio disputes that Stockfood created the Images, and disputes that Stockfood holds a valid copyright to them. (DRSMF ¶ 3). According to Adagio, Stockfood's agreements with its photographers do not grant Stockfood an ownership interest or exclusive license to any photographs, including the Images. (*Id.*).

In the spring of 2018, Stockfood contacted Adagio regarding what it perceived to be the unauthorized use of the Images on one of Adagio's websites. (PSMF ¶ 7). The initial infringement had occurred ten years before, in 2008.[5] (DRSMF ¶ 9). Stockfood claims that it did not grant Adagio permission to use the Images. (PSMF ¶

---

[4]     Attached to Stockfood's complaint are two certificates from the USCO. They both describe the "nature of the work" as "database" and the "[n]ew material included in claim" as "compilation of photographs." (DE 1-2 at 2, 4, 5). Stockfood asserts that these two Images are included in the database compilations. Adagio disputes that the Images were included in the registered "database[s]." (DRSMF ¶ 2).

[5]     Adagio does not directly admit that it was using the Images, but states that, to the extent it did use them, it did not do so in connection with generating revenue or promoting its products. (DRSMF ¶ 8). Elsewhere it states that after being notified of potential infringement, it removed the Images from its website. (DRSMF ¶ 12) I take these statements as implying a concession that the Images were on Adagio's website.

9). While Adagio does not affirmatively claim that it was granted permission, it suggests that it would routinely seek such permission. (DRSMF ¶ 9). Its policy, says Adagio, has always been to use only licensed images on its websites. Although Adagio no longer has records dating back to 2008, it has provided records showing that it has followed this policy in other instances. (DRSMF ¶ 9).

Stockfood notified Adagio of this perceived infringement and attempted to charge Adagio licensing fees for the Images. (PSMF ¶12). Adagio claims that it then immediately removed the Images from its website and tried to pay the fees, but was unable to do so because it received multiple conflicting requests. (DRSMF ¶ 12).

On November 30, 2018, Stockfood filed a complaint in this Court against Adagio, asserting copyright infringement pursuant to 17 U.S.C. § 101, *et seq.* (DE 1). On December 13, 2019, it filed the current motion for partial summary judgment on the issues of liability and willfulness. (DE 19). Adagio responded on January 6, 2020 (DE 20). Stockfood replied on January 14, 2020. (DE 24).

For the reasons below, that motion for summary judgment is granted in part and denied in part.

## II.    Legal Standard

Federal Rule of Civil Procedure 56(a) provides that summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Kreschollek v. S. Stevedoring Co.*, 223 F.3d 202, 204 (3d Cir. 2000). In deciding a motion for summary judgment, a court must construe all facts and inferences in the light most favorable to the nonmoving party. *See Boyle v. Cty. of Allegheny Pa.*, 139 F.3d 386, 393 (3d Cir. 1998). The moving party bears the burden of establishing that no genuine issue of material fact remains. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). "[W]ith respect to an issue on which the nonmoving party bears the burden of proof . . . the burden on the moving party may be discharged by 'showing'—that is, pointing out to the district court—that there is

an absence of evidence to support the nonmoving party's case." *Celotex*, 477 U.S. at 325.

Once the moving party has met the threshold burden, the non-moving party "must do more than simply show that there is some metaphysical doubt as to material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). The opposing party must present actual evidence that creates a genuine issue as to a material fact for trial. *Anderson*, 477 U.S. at 248; *see also* Fed. R. Civ. P. 56(c) (setting forth types of evidence on which the nonmoving party must rely to support its assertion that genuine issues of material fact exist). In deciding a motion for summary judgment, the court's role is not to evaluate and decide the truth of the matter, but to determine whether there is a genuine issue for trial. *Anderson*, 477 U.S. at 249. Credibility determinations are the province of the fact finder. *Big Apple BMW, Inc. v. BMW of N. Am., Inc.*, 974 F.2d 1358, 1363 (3d Cir. 1992).

## III.   Discussion

The Copyright Act of 1976 (the "Act") provides that "[t]he legal or beneficial owner of an exclusive right under a copyright is entitled, . . . to institute an action for any infringement of that particular right committed while he or she is the owner of it." 17 U.S.C. § 501. The Act enumerates six activities, including reproduction, transfer, and public display of the copyrighted work, that the copyright owner has the exclusive right "to do" and "to authorize." 17 U.S.C. § 106.[6] "Anyone who

---

[6]     Subject to sections 107 through 122, the owner of copyright under this title has the exclusive rights to do and to authorize any of the following:

(1) to reproduce the copyrighted work in copies or phonorecords;

(2) to prepare derivative works based upon the copyrighted work;

(3) to distribute copies or phonorecords of the copyrighted work to the public by sale or other transfer of ownership, or by rental, lease, or lending;

(4) in the case of literary, musical, dramatic, and choreographic works, pantomimes, and motion pictures and other audiovisual works, to perform the copyrighted work publicly;

(5) in the case of literary, musical, dramatic, and choreographic works, pantomimes, and pictorial, graphic, or sculptural works, including the

violates any of the exclusive rights of the copyright owner, that is, anyone who trespasses into [the owner's] exclusive domain by using or authorizing the use of the copyrighted work . . . is an infringer of the copyright." *Sony Corp. of Am. v. Universal City Studios, Inc.*, 464 U.S. 417, 433, 104 S. Ct. 774 (1984) (quotation and citation omitted).

A claim for copyright infringement involves two "essential elements: ownership of copyright, and copying by the defendant." *Dam Things from Denmark, a/k/a Troll Company ApS v. Russ Berrie & Company, Inc.*, 290 F.3d 548, 561 (3d Cir. 2002) (citing *Whelan Assocs., Inc. v. Jaslow Dental Lab., Inc.,* 797 F.2d 1222, 1231 (3d Cir. 1986)); *see also Winstead v. Jackson*, 509 Fed. App'x 139, 143 (3d Cir. 2013) (stating that "[t]o establish a claim of copyright infringement, the plaintiff must establish ownership of a valid copyright, and unauthorized copying of protectable elements of the plaintiff's work.").

Adagio challenges both elements. Part III.A addresses whether Stockfood possesses an ownership interest in the Images sufficient to confer standing to sue for copyright infringement. Part III.B addresses whether Adagio copied the Images. As to these issues, there seem to be few facts in dispute; the parties disagree primarily about the legal implications of the Agency Agreements, and I resolve those legal issues in Stockfood's favor.

Part III.C considers a third issue: whether the infringement was "willful," which would allow for enhanced statutory damages. As to this issue, I find that issues of fact stand in the way of summary judgment.

### A. Ownership of Copyright/Standing to Assert Infringement

I first consider the element of ownership, in which I include the closely related issue of standing to sue for infringement. Stockfood points to the Agency Agreements and the USCO certificates of registration as *prima facie* evidence that it

---

      individual images of a motion picture or other audiovisual work, to display the copyrighted work publicly; and

    (6) in the case of sound recordings, to perform the copyrighted work publicly by means of a digital audio transmission.

17 U.S.C. § 106.

owns a valid copyright to the Images.[7] Adagio responds that only holders of exclusive copyright-law-based rights to the Images may bring an infringement suit, and that Stockfood's rights are not exclusive.

A multi-hued word, "exclusive"; in and around copyrights, it is used in at least two senses. Sense # 1: When I say I possess "exclusive" rights in Ms. Copyright Owner's copyright, I may mean that I have the right to exclude others from using the copyrighted material (unless, of course, they pay for the privilege). Sense # 2: When I say I am Ms. Owner's "exclusive" agent, I may mean that I am the only person in the world occupying that status. Both interrelated senses, often conflated, are involved here.

### 1. Whether the Agency Agreements conveyed § 106 rights or just a "bare right to sue"

Adagio's most fundamental argument is that these Agency Agreements do not convey any of the statutory rights associated with a copyright at all. What Stockfood possesses, on this theory, is no more than a bare right to sue on the photographer's behalf. (Def. Br. at 8). The issue is essentially one of contract interpretation.

Adagio says the language in these Agency Agreements is too vague to have conveyed any right under § 106 of the Act; "While the agreements use the term 'exclusive,' they do not specifically enumerate any of Plaintiff's exclusive rights to the photographs. The agreement is wholly silent as to what Plaintiff has the exclusive right to do as the 'agent' of the photographers . . . ." (*Id.* at 7). It is true that the Agency Agreements do not cite 17 U.S.C. § 106 or the rights thereunder, and surely it would have been better if they had done so. Neither, however, is it fair to say that the Agency Agreements are "wholly silent" as to what is being conveyed.

---

[7]     Adagio tangentially suggests in its statement of facts that the two Images at issue were not necessarily in the database of images that Stockfood submitted to the USCO for registration, as described at p. 5 and n. 5, *supra. See* DRSMF ¶ 2 ("Stockfood has provided no evidence that the two photographs were included in the registration of the database or compilation listed on Plaintiff's Copyright Registration Certificates."). Adagio does not press that argument in its brief, however, and it makes little or no difference to the analysis, which does not turn on the presumption.

The Agreements appoint Stockfood as the photographer's "exclusive agent worldwide with respect to licensing the Photographs." (Agency Agreement § 1, DE 20-2 at 2–3, 10). Stockfood agrees to "use its best efforts to license the Photographer's Photographs and to charge and receive reasonable fees for such licensing." (*Id.* § 5(a)). It is authorized to collect such fees from the third-party licensees, by legal action if necessary. (*Id.*). Net fees are split 50-50 between Stockfood and the photographer. (*Id.* § 6(a)).

Like many agents, Stockfood protects itself against circumvention; if it identifies and introduces a customer, the photographer may not then directly license to that customer. (*Id.* § 1(c)). Stockfood has "complete and sole discretion" as to the "terms, conditions and pricing of Photographs licensed to its clients." (*Id.* § 1(d)). Indeed, Stockfood may sell the photo outright, subject only to "consultation" with the photographer. (*Id.*) Stockfood has "sole authority" to determine whether to take legal action, "whether for copyright infringement, loss, damage or any other reason"; to choose an attorney for that purpose; and to enter into settlements, which "shall not be subject to the Photographer's prior approval." (*Id.* § 1(e)).

Missing, as I say, are some magic words—*i.e.*, a verbatim recitation of some right or rights under § 106 that are being conveyed.[8] Most pertinent, in the case of photographs, those would be the rights to "reproduce" the work, "to distribute copies . . . to the public," or "to display the copyrighted work publicly." 17 U.S.C. § 106(1), (3), (5) (quoted in full at pp. 7–8 & n. 6, *supra*). Those rights are defined as the right "to do" those enumerated actions, and also as the right "to authorize" another to do them. 17 U.S.C. § 106. I find that by granting the right to license the photographs, the Agency Agreement did clearly, if impliedly, convey rights under Section 106 of the Act.

---

[8]     Stockfood, perhaps a bit defensively, states that Adagio neglected to conduct depositions, but that if it had done so, it could have "explored and understood the relationship between the photographers and Plaintiff." (Reply Br. at 3). By the same token, I suppose, Stockfood could have filed an affidavit attesting to such facts, if it believed they were important. On this motion, however, the Court is confined to the record the parties made.

When interpreting an agreement purporting to assign copyrights, courts look to state contract law. Where, as here, the parties agreed to a choice-of-law clause, the courts will construe the agreement under the contract law of the chosen state.[9] The Agency Agreement will therefore be interpreted according to Maine contract law. (Agency Agreement § 12(d)).

Under Maine law, "a contract is to be interpreted to give effect to the intention of the parties as reflected in the written instrument, construed in respect to the subject matter, motive and purpose of making the agreement, and the object to be accomplished." *Coastal Ventures v. Alsham Plaza, LLC*, 2010 ME 63, 1 A.3d 416, 424 (Me. 2010). Whether a contract is ambiguous or unambiguous is a question of law; if ambiguous however, its interpretation becomes a question of fact for the factfinder. *Acadia Ins. Co. v. Buck Constr. Co.*, 2000 ME 154, 756 A. 2d 515, 517 (Me. 2000). "Language is considered to be ambiguous if it is reasonably susceptible to different interpretations." *Id.* (citing *Guilford Transp. Indus. V. Pub. Util. Comm'n*, 2000 ME 31, 746 A. 2d 910, 914 (Me. 2000)). Maine courts "interpret language in a contract by its 'generally prevailing meaning.'" *Guilford*, 746 A.2d 910 at 914 (quoting Restatement (Second) of Contracts § 202(3)(A) (1981)). Additionally, Maine courts "look at the entirety of the contract to see if [an] apparent ambiguity is resolved elsewhere in the document." *Id.* at 915. Extrinsic "parol" evidence, such as an understanding between parties not expressly included in the contract, will be barred when the contract is found to be unambiguous. *See Rogers v. Jackson*, 2002, ME 140, 804 A.2d 379, 381 (Me. 2002) ("The parol evidence rule operates to exclude from judicial consideration extrinsic evidence offered to alter or vary unambiguous contractual language.") (quoting *Astor v. Boulos Co.*, 451 A.2d 903, 905 (Me. 1982)). Even if some ambiguity is present, a fully integrated agreement can operate to bar the consideration of extrinsic evidence. *Astor*, 451 A.2d at 905.

No argument is made that this Agency Agreement is not fully integrated. Indeed, it contains an explicit "Entire Agreement" clause. (§ 12(c)). That Stockfood is

---

[9]     *See TD Bank N.A. v. Hill*, 928 F. 3d 259, 273-274 (3d Cir. 2019). Although federal copyright law creates the rights at stake, state law still controls issues of contract interpretation. *See John Wiley & Sons, Inc., v. DRK Photo*, 882 F.3d 394, 412 (2d Cir. 2018).

given the right to "authorize" the exercise of rights to reproduce, distribute, or display the photos—rights arising from the Copyright Act—is the clear sense of the Agency Agreement. Indeed, it is difficult to imagine what else the Agreement *could* mean. The licensing of photographs surely signifies that and nothing else. (*See* 2 MILGRIM ON LICENSING § 15.00 ("The copyright grant, usually . . . gives some right to 'copy, distribute and prepare derivative works . . . .")). One can conjure absurd alternative interpretations; Stockfood could, I suppose, license the photographs to make papier-mache or prop up the short leg of a wobbly table. Such an interpretation does not accord with any reasonable interpretation of the parties' expressed intent. Licensing of photographs *means* the licensing of the reproduction, distribution, and display of photographs.

No court has interpreted "photograph licensing" to mean anything else. It stands to reason that many copyright holders, such as photographers and musicians, are not interested in the day-to-day business of drafting licenses, and would rather outsource those functions to another. Courts presuppose, without much analysis, that such copyright holders may appoint an "exclusive licensing agent." An oft-cited treatise on copyright law assumes the existence and prevalence of "exclusive licensing agents" without declaring that appellation to be a term of art. *See* 3 NIMMER ON COPYRIGHT § 10.03(A)(4) ("[A] license duly executed by the copyright owner's exclusive licensing agent can be treated as the owner's contract as much as if he had executed it in person.") (quotation omitted). Indeed, Nimmer's treatise calls into question whether the appointment of this agent need even be in writing. *See id.* In sum, courts routinely incorporate the concept of an "exclusive licensing agent" which exercises some or all of the principal's Section 106 rights. When a dispute arises, courts generally do not dispute that rights have been conveyed; the issue is usually whether, under the relevant agreement, such rights are exclusive.

Usually, but not always. Adagio provides a counterexample in the form of a case, involving an agreement between a photographer and agent, in which the U.S. Court of Appeals for the Second Circuit held that the assignment agreements did not convey § 106 rights. *John Wiley & Sons, Inc., v. DRK Photo,* 882 F.3d 394 (2d

Cir. 2018). Those agreements, however, differed fundamentally from the Agency Agreements here; they purported to convey the "right to sue" *via* a transfer of "accrued or later accrued claims, causes of action, choses in action . . . or lawsuits, brought to enforce copyrights in the images." *Id.* at 402. An agreement assigning a bare right to sue, *John Wiley* held, fails to satisfy the requirement of the Copyright Act, which grants standing only to the "legal or beneficial owner of an exclusive right under a copyright." *Id.* at 404–05 (citing 17 U.S.C. § 501(b)). Rights other than those listed in Section 106 of the Act, the court held, are excluded by implication. *Id.* at 405. State law cannot, and federal common law does not, *see id.* at 407–10, operate to the contrary. Because a person who is assigned a mere chose in action, or right to sue, has not received any of the six exclusive rights enumerated in Section 106, that person lacks standing under the Copyright Act to sue for infringement. *See* 17 U.S.C. § 106 (quoted at pp. 7–8 & n. 6, *supra*). *John Wiley* thus held that "the Act does not permit a plaintiff assignee to bring a claim for infringement without also having or having had a legal or beneficial ownership in some exclusive right under part of the allegedly infringed copyright." *Id.* at 411.

The *John Wiley* court's analysis demonstrates that those agreements are different from the Agency Agreements here. The court discussed two separate sets of agreements: the "Representation Agreements" and the "Assignment Agreements." It first held that the Representation Agreements did not convey legal or beneficial ownership of an exclusive right under the Copyright Act. The Representation Agreements appointed DRK as the photographer's "agent with respect to the sale or leasing of the photographs . . . ." *Id.* But, critically, "[n]othing in the agreements purport[ed] to establish an *exclusive* principal-agent relationship with respect to either photographer or image." *Id.* (emphasis added). This, the court noted, was in contrast with other agreements DRK had entered into, not at issue in the case, which expressly made DRK the "sole and exclusive agent" of the photographers. *Id.*

Unlike those Representation Agreements, the Agency Agreements between Stockfood and its photographers do expressly provide that the relationship is an exclusive one. Stockfood was appointed "as the Photographer's exclusive agent

worldwide with respect to licensing the Photographs submitted to [Stockfood] by the Photographer." (Agency Agreement § 1(a), DE 20-2 at 1).

*John Wiley* next considered the Assignment Agreements. While the plain language of those agreements stated that all copyrights and legal title were being transferred to DRK, they also provided that the copyright would be reassigned back to the photographers immediately following resolution of infringement actions. *John Wiley*, 882 F. 3d at 411. The court, applying Arizona contract law, also looked to extrinsic evidence regarding the intent of the parties.[10] *Id.* at 413. That extrinsic evidence, the court held, showed that the agreements were intended to "convey only (1) an interest in the images for [USCO] registration purposes, and (2) the bare right to sue for infringement." *Id.* The court noted that "[n]either of [those] rights is among the exclusive rights set forth in Section 106," and accordingly, "their transfer did not render DRK the owner of an exclusive right." *Id.* at 413-414.

Adagio points to a document that is similar to DRK's Assignment Agreement — the Addendum to the Stockfood Agency Agreement. (DE 20-2 at 9, quoted in full at pp. 4–5, *supra*). The Addendum purports to convey ownership of the copyright to Stockfood for purposes of registration, frankly for the purpose of advantage in litigation.[11] The Addendum assures the photographer, however, that the transfer is

---

[10]    Unlike Maine and other states, which allow consideration of extrinsic evidence only where there is facial ambiguity, *see* p. 12, *supra*, Arizona incorporates a "modified" version of the parol evidence rule. That modified rule, applied by *Wiley,* allows the court to "consider extrinsic evidence as a preliminary matter to determine whether 'the contract language is reasonably susceptible to the interpretation asserted by its proponent.'" *Id.* at 413 (quoting *Taylor v. State Farm Mutual Automobile Ins. Co.*, 175 Ariz. 148, 154, 854 P. 2d 1134 (1993)).

[11]    As the Addendum states, registration also opens the door to statutory damages, relieving a plaintiff of the need to prove actual damages. *See* 17 U.S.C. § 412.

    A valid copyright certificate obtained within five years after the date that the work was first published, also entitles the holder to a rebuttable presumption that it owns a valid copyright. 17 U.S.C. § 410(c); *Ford Motor Co. v. Summit Motor Prods., Inc.*, 930 F. 2d 277, 290-91 (3d Cir. 1991). In this case, one of the two certificates of registration, assuming it was registered at all, was filed within five years of the date of publication. Certificate of Registration VA 1-652-320 lists a date of first publication as December 20, 2005 and an effective date of registration as March 13, 2008, a span of two years and three months. (DE 1-2 at 2). The other, however, was not filed timely, so it would not be entitled to a presumption of validity. Certificate of Registration VA 1-341-953 lists a date of first

entirely defeasible, and that ownership will revert to the photographer at the conclusion of any litigation. Such a transfer of ownership may indeed be portrayed as illusory, and Stockfood's registration as a mere flag of convenience. To put it another way, the Addendum, standing alone, might run afoul of the *John Wiley* holding.

But the Addendum does not stand alone. Nothing in the Addendum supersedes or subtracts from the rights that *are* granted to Stockfood elsewhere in the Agency Agreement. We may assume that the Addendum, read alone, conveys only a bare right to sue, but the remainder of the Agency Agreement, as I have already held, conveys more. The right-to-sue argument was dispositive in *John Wiley* because that court found that the entire agreement, viewed as a whole and in the context of extrinsic evidence under Arizona law, did not assign exclusive § 106 rights. As I have held, that is not true of the Agency Agreement here.

Having rejected the argument that the Agency Agreement did not convey rights under the Copyright Act at all, I turn to the arguments that such rights as were conveyed were not "exclusive" in either Sense # 1 or Sense # 2. (*See* p. 9, *supra*).

### 2. Photographers' retention of rights

Stockfood's rights derive from its Agency Agreements with the photographers who are the original owners of the copyrights to the Images. Adagio contends that these agreements did not actually grant Stockfood licensing rights that were "exclusive," because the photographers retained their rights to use and license the Images. Without rights that are "exclusive" in Sense # 1 (*see* p. 9, *supra*), Stockfood lacks standing to assert infringement against a third party. (Def. Br. at 6-7).

When building a wall of exclusivity, the poet teaches, we should ask what we are walling in and walling out.[12] It turns out, counterintuitively, that so-called "exclusive" rights can sometimes be divided or shared between persons.

_____

publication as January 12, 1998, and an effective registration date of June 9, 2006, a span of over eight years. (DE 1-2 at 4).

[12] Robert Frost, "Mending Wall," from *North of Boston* (David Nutt, 1914).

A copyright is a bundle of such "exclusive rights," the violation of which entitles the holder of that right to sue for infringement. 17 U.S.C. § 106 (*see* p. 7N8 & n. 6, *supra*). *See also* 17 U.S.C. § 501(b). At one time, those rights were considered indivisible; a copyright had to be assigned all together or not at all. Since the passage of the Copyright Act in 1976, however, a copyright owner may transfer "[a]ny of the exclusive rights comprised in a copyright, *including any subdivision of any of the rights*." 17 U.S.C. § 201(d)(2) (*emphasis* added). Thus there may be more than one person possessing "exclusive" rights, or even parts of such rights, in a copyrighted work.

Adagio insists that the photographers' assignment of the right to license use of the photographs, while retaining the right to do so themselves, is inconsistent with the concept of "exclusivity." In the absence of on-point authority from the Third Circuit, I find most pertinent the Ninth Circuit case of *Minden Pictures, Inc. v. John Wiley & Sons, Inc.*, 795 F. 3d 997 (9th Cir. 2015). There, a photographer, while retaining the right to issue licenses on his own, entered into an agency agreement with a licensing agent, Minden.[13] The agent in turn licensed the photographs to a publisher for use in a textbook. When the textbook publisher exceeded the scope of the license, the agent sued for infringement. The agency agreement, *Minden* held, conveyed a sufficient interest to give the licensing agent standing to sue the textbook publisher.

There, as here, the photographer retained his own licensing rights even as he transferred such rights to the agency. *Minden* reasoned that it did not matter, for the following reasons. The Copyright Act of 1976 permits an owner to subdivide and transfer rights, via an assignment (transfer of title) or exclusive license (granting the transferee exclusive use). *Minden*, 795 F.3d at 1002–03. Either way, the transferee has the right to sue for infringement of the right that was transferred. *Id.* at 1003. A mere nonexclusive licensee, however—a person granted permission to use the work but not to prevent others from using it (like, say, the textbook publisher)—lacks

---

[13]    Actually multiple photographers had separate agreements with Minden, but I simplify.

standing to sue for infringement. *Id.* Because a nonexclusive licensee has been "granted rights only vis-à-vis the licensor, not vis-à-vis the world, he or she has no legal right to exclude others from using the copyrighted work and thus no standing to bring an infringement suit." *Id.* at 1004.

The agency agreement in *Minden* did not merely permit the licensing agent to copy the copyrighted photos without fear of being sued for infringement. Rather, it conveyed to the licensing agent the authority to license the use of the photographers' images to third parties for the photographer's and the agent's mutual profit. The right to authorize reproduction of copyrighted material, *Minden* held, is an "exclusive right" under the Act. *Id.* at 1003. The textbook publisher objected that the photographers also retained the right to license the photographs themselves, and argued that this was inconsistent with their having assigned "exclusive" rights to the licensing agency. *Id.* at 1004. The Ninth Circuit disagreed.

Step one of the *Minden* court's reasoning was that, since the enactment of the Act in 1976, so-called "exclusive" rights have been legally divisible, or shareable.[14] *See Minden*, 795 F. 3d at 1004. Step two was that the same divisibility principle should apply "when the interest granted is an exclusive license to grant licenses to others." *Id.* Thus the licensing agency did not stand in the shoes of a nonexclusive licensee, permitted to use the work but not to prevent others from doing so. Rather, the licensing agency stood in the shoes of the photographer with respect to the licensing rights that were assigned to it from the photographer.[15]

---

[14]     As an example, *Minden* cited the principle that co-owners as well as sole owners of copyrights may possess "exclusive" rights. *Id.* The proposition of law is correct, but the illustration was perhaps inapt, because it introduces the different, and extraneous, issue of what rights a co-owner can convey without the consent of the other co-owner. *See* discussion of *Tresóna Multimedia, LLC v. Burbank High School Vocal Music*, 953 F.3d 638 (9th Cir. 2020), at pp. 20–21, *infra*.

[15]     Patent law, the *Minden* court observed, is at least as permissive, and has long been so. *Id.* at 1004–05 (citing *Western Elec. Co. v. Pacent Reproducer Corp.*, 42 F.2d 116, 119 (2d Cir. 1930) ("exclusive licensee" is not necessarily a "sole licensee"); *WiAV Solutions LLC v. Motorola, Inc.*, 631 F.3d 1257, 1266 (Fed. Cir. 2010) (rejecting the argument "that for a licensee to be an exclusive licensee of a patent, the licensee must be the only party with the ability to license the patent"). "Exclusive" is here used in Sense #1.

17

The manifest intent of the agency agreement was to grant the agency the capacity to grant, and charge for, licenses to reproduce the work. The *Minden* court accordingly saw "no reason why, having appointed Minden to manage the commercial use of their photographs in the first instance as their licensing agent, the photographers should not also be able to rely on [the licensing agency] to protect and defend the licenses that it has issued on their behalf." *Id.* at 1005.

"Exclusive," then, is something of a term of art, which must be read in the context of the divisibility of copyright rights:

> That the photographers have retained some limited degree of authority to grant licenses themselves does not eliminate Minden's interest in the copyright as the sole entity to act as the photographers' licensing agent. It merely means that both Minden and the photographers, under the terms of the Agreements, can prevent those third parties who have not received permission to use the photographs from using them.

*Id.* at 1004–05.

As that principle applied to the *Minden* facts, it meant the following: To have "exclusive" rights (again, in Sense # 1), the agent had to possess the power to exclude the rights of third parties, but the agent did not have to possess the power to exclude the rights *of the photographer*. (*Minden* also required the agent be the *sole* person given that power, *i.e.*, that the grant be "exclusive" in Sense #2. I discuss that issue in the following subsection.). So what did the photographer convey to the licensing agency in *Minden*? It conveyed the right to grant a license and to sue for infringement someone who exceeded the bounds of such a license or had no license at all; it did not convey the right to sue the photographer, or a person who had received a license directly from the photographer.[16]

---

[16]     To look at it another way, the agency stood in the shoes of the photographer, who could not sue himself or a person he had granted a license. Now of course a copyright owner could choose to alienate its full bundle of rights, including *its own* right to use or reproduce the copyrighted work. In such a case, "an exclusive licensee may sue others for infringement, including the licensor if the licensor infringes on the exclusive right he granted the licensee." *Davis v. Blige*, 505 F.3d 90, 101 (2d Cir. 2007). The point of *Minden* is that, because copyright rights are divisible, the owner *could* but did not *have to* do that.

The Agency Agreements in this case, as Adagio points out, authorize Stockfood to license the images, but do not bar the photographers from continuing to do so on their own.[17] That limited reservation of rights, under *Minden,* does not undermine exclusivity, or deny Stockfood standing to sue persons other than the photographer or the photographer's direct licensees.

I discuss briefly a superficially confounding issue that does not actually affect the outcome of this case. *Minden* leaves untouched the distinct requirement that, where a copyright has two co-owners, an exclusive license cannot be granted without the consent of both. Any analogy to copyright co-owners, however, is flawed as a matter of law. In *Tresóna Multimedia, LLC v. Burbank High School Vocal Music*, 953 F.3d 638 (9th Cir. 2020), the court clarified that *Minden* neither undermined, nor was undermined by, the "co-owner" case law.

The reason is this. It is well established that co-owner #1 cannot unilaterally grant an exclusive license without the consent of co-owner #2. In such a case, co-owner #1 has independent ownership rights, which it did not receive, by transfer or otherwise, from co-owner #2. Conversely, co-owner #2 has independent ownership rights, which it did not receive from co-owner #1. Both, as it were, were "born with" their copyright rights. It follows that neither can convey rights belonging to the other, without that other's consent. The rights of co-owner #2 are subject to those of co-owner #1, and vice versa, and a party cannot convey more than it possesses. The upshot of *Tresóna* was that "Tresóna received its copyright interests in the songs '(I've Had) The Time of My Life,' 'Hotel California,' and 'Don't Phunk With My Heart,' as a license from an individual co-owner of those interests without the consent of the other co-owners," and therefore lacked standing to sue for infringement. 953 F.3d at 645.

---

[17]     Indeed, contemplating just that situation, the Agency Agreements protect Stockfood's interest with a non-compete clause. Such clauses, common in agreements with agents or brokers, prohibits the principal and third party from circumventing the agent. This clause recognizes that the photographer may continue to license the use of the photographs directly, but may not do so with respect to any customer introduced to the photographer by Stockfood. (*See* p. 3, *supra.*)

The issue in *Minden,* the *Tresóna* court reasoned, was different. In *Minden,* the agency obtained its rights, not from one of two co-owners, but from the single and sole owner of the copyright, the photographer. "In other words, even if an exclusive right is shared between two entities, a sole owner can promise exclusivity to just those two, while a co-owner cannot make that same promise unilaterally. Because the issue of whether a co-owner of a copyright interest can unilaterally grant an exclusive license to that interest was not present in *Minden Pictures*, Tresóna's reliance on *Minden Pictures* is misplaced." *Tresóna*, 953 F.3d at 645. In short, the exclusivity issue as between independent co-owners is different from the one between a sole owner and the person to whom it has conveyed an interest.

Similar to *Tresóna*, and therefore similarly distinguishable from the issue at hand, is the Third Circuit's holding in *Brownstein v. Lindsay*, 742 F. 3d 55, 68 (3d Cir. 2014). *Brownstein,* like *Tresóna*, was confined to the co-owner issue. Having found a certain piece of software to be a work of joint authorship, the Third Circuit held that a unilateral transfer of ownership by one of the copyright co-owners was ineffective: "With respect to transferring the ownership of a joint work, a co-author cannot transfer the ownership interest of his co-author." *Id.* at 68. The purported licensing or transfer agreements, then, could not convey more than a non-exclusive right to use the work. Without the consent of both co-owners, those agreements could not grant ownership or exclusive rights, which would entitle the transferee to sue third parties for infringement. *Id.* at 68–69.

This case falls on the *Minden* side of the *Minden/Tresóna* divide. Stockfood was not a copyright co-owner "at birth," with its own independent rights, which the photographer had no right to impair. On the contrary, any interest Stockfood possessed is one that it obtained *from* the sole (not joint) copyright holder, the photographer. The photographer had full power to convey any portion of the rights associated with the copyright. As in *Minden*, "[t]hat the photographers have retained some limited degree of authority to grant licenses themselves does not eliminate [Stockfood's] interest in the copyright as the sole entity to act as the photographers' licensing agent. It merely means that both [Stockfood] and the photographers,

20

under the terms of the Agreements, can prevent those third parties who have not received permission to use the photographs from using them." *Minden*, 795 F. 3d at 1004–05.

In short, Stockfood's rights were exclusive in Sense # 1.

### 3. Whether the rights were granted to Stockfood on a "sole and exclusive" basis

Adagio also argues that, even assuming Stockfood acceded to some of the photographers' Section 106 rights, and even assuming that the photographer's retention of rights did not undermine exclusivity, Stockfood still lacks standing because it was not appointed as the photographers' "sole and exclusive" agent (in Sense #2). A photographer's appointment of multiple agents, or even its ability to do so, says Adagio, is inconsistent with the concept of "exclusivity."

Adagio's view that *Minden* requires exclusivity in Sense #2, as well as Sense #1, has support:

> "Put more simply, we agree with the Seventh Circuit that the essence of an "exclusive" license under the Act is that "the copyright holder permits the licensee to use the protected material for a specific use and *further promises that the same permission will not be given to others.*" *I.A.E., Inc. v. Shaver*, 74 F.3d 768, 775 (7th Cir. 1996). Minden has been given just such a promise. Under the Agency Agreements, Minden is the "sole and exclusive agent and representative with respect to the Licensing of any and all uses" of the photographs. That is, the photographers have promised that *Minden, and only Minden, will have the power,* as the photographers' licensing agent, to authorize third parties to reproduce, distribute, and display the photographs.

*Id.* at 1004–05 (emphasis added).

The question, then, is whether Stockfood was merely *an* agent, or was the photographers' *sole and exclusive* agent, for licensing of photos.

As the Ninth Circuit ruled in a post-*Minden* case, that issue depends on the terms of the agreement between the agent and the photographer/copyright owner. *DRK Photo v. McGraw-Hill Global Education Holdings, LLC,* 870 F.3d 978 (9th Cir. 2017). Examining the agency agreements in that case, the *McGraw-Hill* court found that they permitted the photographers to appoint other agents. Indeed, not only did

they fail to label DRK as an "exclusive" agent, but they expressly provided that any sales or leases DRK entered into were presumptively non-exclusive. *See id.* at 981 ("DRK PHOTO will not require, nor ask a photographer or agency for exclusivity of an image until such time that DRK PHOTO has made an exclusive sale of the image . . . .") (quoting the agreement). These agreements did not have language parallel to the language in the *Minden* agreements, which provided in substance "that Minden, and *only* Minden, will have the power, as the photographers' licensing agent, to authorize third parties to reproduce, distribute, and display the photographs." *Id.* at 984 (quoting *Minden,* 795 F.3d at 1005). The *McGraw-Hill* court added that the agreements "also lack any limitation whatsoever on the photographers' authority to contract with other licensing agents. In the absence of any such promise, DRK's Representation Agreements confer nonexclusive licenses and do not render DRK a legal owner for standing purposes." *Id.* at 984–85.

The Stockfood Agency Agreements, in Adagio's view, "do not expressly confer any exclusive rights on Plaintiff or [contain] meaningful restrictions on the Photographers to prevent them from licensing the photographs at issue to other parties including other agencies." (Def. Br. at 7). I disagree; the Agency Agreements here do not resemble those in *McGraw-Hill.* They do in fact expressly grant Stockfood, and *only* Stockfood, the exclusive right to act as the photographer's licensing agent with respect to the photos. Both Agency Agreements provide that "[t]he Photographer hereby appoints [Stockfood], and [Stockfood] hereby accepts such appointment, as the Photographer's *exclusive agent* worldwide *with respect to licensing* the Photographs submitted to [Stockfood] by the Photographer." (DE 20-2 at 1, 10 (*emphasis* added)). An appointment as the photographer's exclusive agent worldwide, I find, is sufficiently specific; it does not permit the appointment of another licensing agent for the same copyrighted works.

However, that is exactly what Adagio argues has occurred. It points to a posting on the HuffPost website which includes a copy of one of the Images bearing the caption "Maas, Rita via Getty Images." (Def. Br. at 8). The implication is that Rita Maas, one of the two photographers involved in this case, has given Getty

22

Images, another stock image agency, the ability to license the Image for use by HuffPost.

First, it is not clear that this implication is true. The Image could have been licensed to Getty Images by Stockfood, or Getty Images could have been granted a one-time non-exclusive license from Rita Maas. Second, even if true, it may indicate no more than Maas's breach of her contract with Stockfood; there is no reason that the photographer's breach, if it occurred,[18] would deprive Stockfood of the rights for which it bargained. Adagio therefore raises no facts indicating that Stockfood's appointment as licensing agent was not exclusive in Sense #2.

\*       \*       \*

Altogether, it is clear from the face of the Agency Agreement that the photographers intended to appoint Stockfood as their exclusive licensing agent. That appointment carried with it the grant of the exclusive right to act as a licensing agent, that is, to authorize the reproduction, distribution, and display of the Images in return for a fee that would be shared with the photographer. Moreover, that right was exclusive; under *Minden,* the photographers' retention of limited licensing rights does not undermine exclusivity as a matter of law, and the Agency Agreements provide that Stockfood is the photographers' sole and exclusive agent worldwide.

Because Stockfood is entitled to judgment as a matter of law based on the record, I grant summary judgment in favor of Stockfood as to ownership and standing to sue for infringement.

### B. Infringement

Having established that it has standing to bring a suit for infringement, Stockfood seeks summary judgment as to whether Adagio infringed its copyrights. Adagio does not dispute that posting the Images on its website without a license would infringe the rights of the copyright owner. Instead, Adagio suggests that it

---

[18]      I clarify that I am not stating that such a breach occurred, but considering *arguendo* what the consequences of such a breach would be.

has raised a genuine dispute requiring a trial as to whether it did possess a license to use the images. (Def. Br. 4-6).

In support of that argument, Adagio proffers that its usual policy would have been to obtain a license. (*Id.*). Adagio does not, however, submit an affidavit claiming that it did in fact have a license for the Images. This issue does not, therefore, require a credibility determination. Adagio offers only that it usually obtains licenses, could have obtained a license from Stockfood or someone else, and therefore has raised a triable factual issue as to its possession of a license.[19] This does not rise above the level of speculation. It is not sufficient to create a genuine dispute as to whether the use of the Images was licensed and permissible.

Accordingly, I grant summary judgment in favor of Stockfood as to whether Adagio infringed by posting the Images.

---

[19]    In support of this second contention, Adagio notes that one of the images was featured in an article by the Huffington Post, with a caption indicating that the image was licensed by Getty, another stock image licensing service. (Def. Br. at 5). But it offers no evidence that this was it was in fact the same image (and not merely a similar-looking one by the same photographer); that Getty in fact had rights to the image; or that Adagio had obtained a license from Getty. *See also* discussion at p. 24, *supra.* Apparently no party obtained any evidence or affidavit from Getty. Like Adagio's other arguments on this point, this one raises a hypothetical possibility, not a fact supported by evidence.

**C. Willfulness**

Having established infringement, Stockfood also seeks summary judgment on the issue of whether Adagio's infringing conduct was willful. This determination affects the amount of damages Stockfood can ultimately recover. *See* 17 U.S.C. § 504(c)(2).

Stockfood cites several precedents from the Second Circuit holding that willfulness can be established at the summary judgment stage. (Pl. Br. at 7-8). Adagio does not dispute that as an abstract proposition. Rather, it focuses on the evidence for Stockfood's contentions, arguing that Stockfood has not established the lack of a genuine issue as to Adagio's willfulness.

"In a case where the copyright owner sustains the burden of proving, and the court finds, that infringement was committed willfully, the court in its discretion may increase the award of statutory damages to a sum of not more than $150,000." 17 U.S.C. § 504(c)(2). The statute does not define willfulness, nor has the Third Circuit established a comprehensive test.[20] The Second Circuit, however, has adopted the following standard:

> To prove 'willfulness' under the Copyright Act, the plaintiff must show (1) that the defendant was actually aware of the infringing activity, or (2) that the defendant's actions were the result of 'reckless disregard' for, or 'willful blindness' to, the copyright holder's rights. Willfulness may be proven on summary judgment, so long as the court draws all reasonable inferences in the defendant's favor.

*Jose Luis Pelaez, Inc. v. McGraw-Hill Global Educ. Holdings LLC*, 399 F. Supp. 3d 120, 146 (S.D.N.Y. 2019) (citing, *inter alia, Island Software & Computer Serv., Inc. v. Microsoft Corp.*, 413 F.3d 257, 263 (2d Cir. 2005)). Adagio does not quarrel with the Second Circuit standard, and I adopt it *arguendo*.

---

[20] Stockfood cites only one case from the Third Circuit, contending that it stands for the proposition that it need only show that the defendant copied the images "deliberately." (Reply Br. at 4 (citing *Williams Electronics, Inc. v. Artic Int'l, Inc.*, 685 F. 2d 870 (3d Cir. 1982)). But this case did not elaborate on a standard for willfulness—it merely made a procedural point that the defendant ought to have to opportunity "to present evidence rebutting the charge of willful and deliberate infringement" before the court bound itself to granting statutory damages. *See Williams*, 685 F. 2d at 878.

25

Stockfood argues that the evidence shows both "reckless disregard" for and "willful blindness" to its rights. Adagio, it says, offered no evidence that its infringement was accidental, that it made any effort to identify the owner of the Images, or that it had any policy in place to avoid the unauthorized use of copyrighted images. (Pl. Br. at 7-9).

Adagio counters that it does in fact have a policy of licensing its images, as evidenced by deposition testimony from its CEO and a sampling of licensing fees paid in other instances. (Def Br. at 9-10). Stockfood criticizes this evidence as insufficient, because there is no evidence that Adagio had adopted a formal or written policy. That circumstance may go to the weight of, but does not negate, the evidence. To agree with Stockfood here would be to impermissibly discount Adagio's evidence of its own state of mind. Under the summary judgment standard, that cannot be done.

Adagio also provides testimony that it removed the Images from its website "within hours of first being contacted by Plaintiff and immediately advised Plaintiff that the images had been removed." (*Id.* at 10). That fact, says Adagio, is a key differentiator between its conduct and the willful conduct of the parties in the cases cited by Stockfood.

Ultimately, Stockfood does not point to direct evidence that Adagio's conduct was actually willful. Rather, it effectively shifts the burden to Adagio by highlighting the lack of evidence negating willfulness. (Reply Br. at 4-5). At the summary judgment stage, I must draw reasonable inferences in the non-movant's favor. Here, Adagio has put forth some evidence (deposition testimony of its licensing policy and its immediate removal of the infringing content) that even if it did infringe, it did not do so willfully. That evidence would not necessarily compel a finding in Adagio's favor, but that is not the issue; Stockfood, not Adagio, is moving for summary judgment, and these facts constitute some evidence that Adagio's conduct was not willful.[21]

---

[21]    Consider also that Stockfood brought suit some ten years after the infringement allegedly began. Adagio's inability to bring forth more direct evidence may therefore have less significance than Stockfood gives it.

There is enough conflicting evidence here to raise a genuine dispute. Accordingly, summary judgment is denied as to the issue of willfulness.

## IV.    Conclusion

For the reasons set forth above, Stockfood's motion for summary judgment (DE 19) is **GRANTED** as to liability (ownership and infringement) and **DENIED** as to whether Adagio's conduct was willful.

Dated:  July 31, 2020

/s/ Kevin McNulty

_____

**HON. KEVIN MCNULTY, U.S.D.J.**

27